UNITED STATES v. AMERICAN COLUMN & LUMBER CO. and 332 other defendants.

(District Court, W. D. Tennessee, W. D.    March 16, 1920.)

No. 751.

1. MONOPOLIES ⬤⟐12(1)—DESIGN TO ACCOMPLISH COMMON PURPOSE CONSTITUTES "COMBINATION" OR "CONSPIRACY," WITHIN ANTI-TRUST ACT.

There was a "combination" or "conspiracy," within Anti-Trust Act July 2, 1890, § 1 (Comp. St. § 8820), if there was, in the minds of two or more of the members of a so-called open competition plan, a design to accomplish by and through such plan a common purpose, as a combination or conspiracy consists in a mere meeting of the minds of two or more persons to accomplish a common purpose.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Combination; Conspiracy.]

2. CONSPIRACY ⬤⟐1—NOT NECESSARILY UNLAWFUL.

A combination or conspiracy is not necessarily unlawful.

3. CONSPIRACY ⬤⟐1—LAWFUL COMBINATION MAY BE RENDERED UNLAWFUL BY UNLAWFUL ACTS.

A combination or conspiracy in itself lawful may be made unlawful by acts in furtherance thereof, which are themselves unlawful.

4. CONSPIRACY ⬤⟐19—UNLAWFUL CONSPIRACY MAY BE CONDEMNED BECAUSE OF ACTS NOT IN THEMSELVES UNLAWFUL.

An unlawful conspiracy, when proved, may be brought under condemnation of law by proof of facts and circumstances done in furtherance thereof, which are not in themselves unlawful.

5. MONOPOLIES ⬤⟐12(1)—COMBINATION OR ASSOCIATION TO RESTRAIN TRADE IS UNLAWFUL.

A combination or association restraining trade in interstate commerce is unlawful, under Anti-Trust Act July 2, 1890, § 1 (Comp. St. § 8820).

6. MONOPOLIES ⬤⟐21—ACT OR DECLARATION OF PARTY TO COMBINATION TO RESTRAIN TRADE IS ACT OF ALL.

When a combination or association restrains trade in interstate commerce, any act done or anything said or written by any member of the combination in furtherance of its object is the act of all.

7. MONOPOLIES ⬤⟐21—MEMBERS OF COMBINATION RESPONSIBLE FOR AGENT'S ACTS.

Where members of a so-called open competition plan employed a manager of statistics and furnished him quarters and clerical assistance, and he gathered information from individual members, had it tabulated and sent back to each of the members, advised and suggested the manner of conducting their business, and made monthly reports as to the condition

---

⬤⟐For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of the trade, and the members thus knew what he was doing, they were liable for his acts in violation of Anti-Trust Act July 2, 1890 (Comp. St. §§ 8820–8823, 8827–8830).

8. MONOPOLIES ⊚⇒24(2)—EVIDENCE HELD TO SHOW THAT PURPOSE OF COMBINA-TION WAS TO SUPPRESS COMPETITION IN HARDWOOD LUMBER.

Evidence on an application for a preliminary injunction in a suit under Anti-Trust Act July 2, 1890 (Comp. St. §§ 8820–8823, 8827–8830), *held* to show that the purpose and intention of a so-called open competition plan, consisting in part of the distribution of reports of prices for which sales had been made was to suppress competition in the sale of hardwood lumber, increase prices, and decrease production.

In Equity.   Suit by the United States against the American Column & Lumber Company and 332 other defendants.   On application for a preliminary injunction under the federal Anti-Trust Act of July 2, 1890, on the pleadings, and affidavits.   Injunction granted.

Charles B. Ames, Asst. Atty. Gen., Henry S. Mitchell and Black-burn Esterline, Sp. Asst. Attys. Gen., William D. Kyser, U. S. Atty., and Thomas J. Walsh, Asst. U. S. Atty., both of Memphis, Tenn., for application.

L. C. Boyle and G. Carroll Todd, both of Washington, D. C., W. H. Fitzhugh and Harry B. Anderson, both of Memphis, Tenn., and L. C. Bell, of Columbus, Ohio, opposed.

McCALL, District Judge.   This is an application for preliminary injunction.   The bill of complaint is brought under section 4 of an Act of Congress (26 Stat. 209 [Comp. St. § 8823]), by the United States of America against the American Column & Lumber Company and 332 other manufacturers of hardwood lumber, residents and citizens of some 16 different states, charging the defendants with combining and conspiring together to suppress competition amongst themselves, and to enhance their selling prices for such lumber, in restraint of interstate commerce, in violation of section 1 of said act of Congress (section 8820), which is as follows:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal."

It is alleged that the defendant companies comprise the most important manufacturers of hardwood lumber in the United States, and have been so engaged for a long time, in the states and at the places indicated in the bill of complaint, in cutting down trees of the hardwood varieties and converting them into logs, in moving such logs to sawmills and lumber factories, in manufacturing them into lumber, and in the selling and shipping of such lumber, in interstate commerce, to manufacturers of sashes, doors, flooring, mill work, etc., and to other manufacturers and to wholesale and retail dealers for the purposes of resale, and that at the beginning of the year 1919 the defendant companies were still demanding for their lumber approximately the same prices that had prevailed before the signing of the armistice in the war with Germany, and that manufacturers and wholesale and

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

retail dealers were buying from the defendants only in small quantities, for the purposes of immediate necessities, in the belief that the prices demanded were too high, and they were intending to largely increase their purchases of such lumber from the defendants, in interstate commerce, as soon as the prices should be reduced by competition among the defendants to more reasonable levels.

Under these circumstances, in January, 1919, and continuously thereafter to the present time, it is further alleged that the defendant companies and individual defendants unlawfully combined and conspired together, in restraint of interstate commerce in hardwood lumber manufactured by them, to maintain the prices demanded in said month of January, 1919, for their lumber and to double and treble the prices, in violation of the said act of Congress and against the public policy of the United States, by suppressing competition in prices amongst the defendants, by substituting therefor co-operation and agreements among themselves having the purpose and effect of maintaining and increasing prices.

The bill then proceeds to state the means resorted to by defendants to accomplish the purpose of the alleged combination and conspiracy, which are in substance as follows (hereinafter referred to as overt acts): By joining together as members of a so-called "open competition plan" under the slogan "Co-operation, not Competition, is the Life of Trade," and by providing and financially supporting at Memphis, Tenn., a suite of offices, clerical force, and the defendant F. R. Gadd as manager of statistics, for the successful operation of said plan; by dividing the members of the plan into four geographical groups, and holding meetings of each group each month; by printing and causing to be distributed amongst the defendants recommendations to make oral agreements at such meetings to eliminate competition amongst these defendants who had been competing, and by this means to suppress "evil practices," meaning thereby the practice of competing in prices so as to secure business, by requiring each member of the plan to make monthly "stock reports" to the manager of statistics, showing the normal stock, the entire actual stock, the unsold stock, of each defendant company, and also to make to said manager "production reports," showing the normal monthly production, the actual monthly production, and the estimated future production of each defendant company, and also "sales reports" showing separately each actual sale of hardwood lumber made by each defendant company, giving the name of the buyer, the kind of lumber sold, the destination, and the selling price; by having these reports tabulated by the manager of statistics and distributed amongst the members of the plan; by distributing amongst the defendants printed recommendations to discuss prices at their monthly meetings, and orally discussing at such monthly meetings said stock reports, production reports, and sales reports, so as to produce at each of such meetings a mutual exchange of oral statements of approval of high prices reported in the sales reports, as assurances that the defendants would further sustain such prices by maintaining prices as high as or higher than such prices; by mutually exchanging each month through the manager of statistics, in connection with the pro-

duction reports, written predictions by the several defendants that high prices reported in the sales reports would continue to be maintained and enhanced, so as to thus furnish further assurance that the action of each defendant in maintaining and enhancing such price would be supported by like action on the part of other members of the plan; by having distributed by the manager of statistics amongst the defendants printed expositions of the theory of each defendant, to be observed as a guide to prices reported as received by other defendants, to the effect that knowledge regarding prices actually received is all that is necessary to keep prices at reasonably stable and normal levels, there being no agreement to follow the practices of others, although members do naturally follow their most intelligent competitors, if they know what their competitors have been actually doing, this being the theoretical proposition at the basis of the open competition plan; by having questionnaires sent out by the manager of statistics to each member of the plan, asking for information showing how the theory of the open competition plan worked in practice, and that the manager of statistics edited these answers and caused to be distributed amongst the members such parts of them as tended to show that it was successful in producing a steady advance in the prices of their products; by printing and causing to be distributed among the defendants arguments against low prices, on the ground of shortage of lumber disclosed by the stock reports, and explaining how the disclosure of such shortage in the stock reports prevented prices from being lowered, followed by arguments for still higher prices on the ground of the shortage disclosed; the continued co-operation to secure higher prices on the ground of shortage in stocks, and the elimination of competition; by causing to be reprinted with approval, and distributed amongst themselves, statements emphasizing the advance of prices following the shortage of lumber, and urging the defendants against increasing production by night work, which would in effect "kill the goose that laid the golden eggs" and would be criminal folly, coupled with the suggestion made in the sales report that their combination or association, called the "open competition plan," to maintain and enhance prices would not be prosecuted, that prices would continue to advance so long as the shortage of lumber was maintained, and that the Sherman Law, designed to prevent the restraint of trade, should be repealed.

It is further alleged that similar means are still being employed and are about to be further employed by the defendants, at Memphis and elsewhere, in consummation of their alleged unlawful combination and conspiracy to maintain the prices of hardwood lumber at, and enhance it beyond, the present high levels, in restraint of interstate commerce in such lumber. It is the doing of these things by the defendants, characterized as overt acts, that the court is asked to enjoin.

The defendants file a sworn answer, in which they substantially admit doing the things charged in the bill, characterized as overt acts. They deny that they were wrongful acts, and assert that the defendants were clearly within their rights under the law in the course which has been pursued, and especially do they deny every charge or

intimation in the bill of any unlawful combination or conspiracy, and that the doing of those things did not and does not restrain trade in interstate commerce; but, on the other hand, it is asserted that the open competition plan promotes competition in interstate commerce, and especially among the members of the plan, in that it furnishes them with information by which they can more intelligently and effectively conduct the management of their business as manufacturers of hardwood lumber. They deny that the defendants, by their course of conduct as charged in the bill, curtailed production or suppressed competition in, or maintained and increased prices of, manufactured hardwood lumber.

Much documentary evidence and many affidavits were introduced in support of the contention of the respective parties, all of which were documents coming from the office of the manager of statistics, or affidavits of the defendants themselves, except a certain line of affidavits by parties who were not members of the plan, but who were dealers in hardwood lumber, or furnished supplies to the defendants for the manufacture thereof. In the view the court has taken of the case these latter affidavits, in so far as they are material to the question to be decided, are but expressions of opinion of the party making the affidavit. It should be said that the affidavits made and filed by the defendants do not controvert the allegations made in the bill of overt acts, but they do deny that affiants were parties to any combination or conspiracy or agreement to restrain trade in interstate commerce in the hardwood manufacturing business, by suppressing competition in prices among themselves or otherwise.

As the court understands this record, there is no conflicting evidence to reconcile, since it comes entirely from the defendants and, whatever the case is for the government, it is made such by the acts and words of the defendants, or some of them, themselves. It therefore remains for the court to determine whether the conclusions drawn from the evidence of the government, as stated in the bill of complaint, are in its judgment warranted.

[1] The first question arising is whether the defendants in associating themselves together under the so-called "open competition plan" thereby formed a combination or conspiracy. In other words, was there in the minds of two or more of the defendants a design to accomplish by and through the plan a common purpose? · If so, there was a combination or conspiracy, since a combination or conspiracy consists only in a mere meeting of the minds of two or more persons to accomplish a common purpose. Pettibone v. United States, 148 U. S. 203, 13 Sup. Ct. 542, 37 L. Ed. 419; Bouvier's Law Dictionary, vol. 1, p. 621.

[2-4] A combination or conspiracy is not necessarily unlawful, but if unlawful, then anything done or said by a party thereto to consummate the unlawful purpose need not in itself be unlawful. So, also, a combination or conspiracy in itself lawful may be made unlawful by acts in furtherance thereof which are themselves unlawful. An unlawful conspiracy, when proven, may be brought under condemnation of law by proof of facts and circumstances done in furtherance thereof

which are not in themselves unlawful. So a conspiracy which has for its object the accomplishment of a lawful purpose may be brought into condemnation of the law by doing unlawful things to consummate that purpose. It cannot be with reason denied, nor indeed do I understand that it is denied, by the defendants, that they formed an association, a combination, or an agreement, to promote the interests of the members of the plan who were engaged in the manufacture of hardwood lumber.

[5, 6] The second and more difficult question is: Did and does this combination or association restrain trade in interstate commerce, within the meaning of the law? If so, it is unlawful, and any act done or anything said or written by any member of the plan in furtherance of its object was the act of all and the injunction should issue.

The evidence shows that the defendants were members of the American Hardwood Manufacturers' Association (hereinafter called the association), but that all the members of said association are not members of the "open competition plan." Query: What benefits did those members of the association who joined the plan expect to derive from it which were not equally available in the association alone?· There must have been some additional advantage contemplated and expected. That purpose, I think, can best be determined from the evidence tending to show what the members of the plan said and did from the time of its formation and on up through the months until this suit was filed.

[7] As has been seen, this evidence was created by the defendants themselves, and it is uncontroverted. We come now to consider it. Before doing so, however, it is well to dispose of the insistence by counsel for the defendants that the members of the plan should not be held responsible for what F. R. Gadd, the manager of statistics, did, wrote, or said in conducting the business of the plan. I cannot agree with that contention. Mr. Gadd was employed by the members of the plan; he was furnished quarters and clerical assistance at Memphis, Tenn.; he it was that gathered information from the individual members; he it was that tabulated it, and, thus tabulated, he it was that sent it back to each of the members; he it was that advised the members or suggested the manner of conducting the business; he advised the members of all that he knew or gathered from the individual members through their monthly reports as to the condition of the trade. The members of the plan thus knew what he was doing. He was the agent employed by them to conduct the business of the plan, and, judging from this record, he did it successfully and to the satisfaction of its members. His office was the clearing house of the plan's business. Under such circumstances, when the members of the plan are summoned into court to show cause why they should not be enjoined ·from further prosecuting the business of the plan as perfected and practiced by their agent, Mr. Gadd, for them, the wrongs done should not, either in law, equity, or good conscience, be shifted to the shoulders of Mr. Gadd and those for whom he acted, with their knowledge, consent, and approval, be permitted to go hence without blame.

[8] Recurring now to the evidence: It appears that in the early months of 1919 the stock of hardwood lumber on hand was low, the demand was light, and prices at a comparatively high level. The

first sales report by Mr. Gadd, as manager of statistics, was issued on January 25, 1919, and issued weekly thereafter. Quoting from the first one we read:

"Co-operation, not competition, is the life of trade. Membership in the plan is not compulsory, but members who enter into the plan and practice the idea of a fair deal for all, eliminating suspicion and acting with good will toward each other, will find that returns come back to them with added interest in dollars and cents."

### February 3:

"Before the organization of this plan, while some of the members knew some of the other members, in a majority of cases they were competing with each other, even when neighbors without a personal acquaintance."

### February 8:

"The matter of price is the principal point at issue between the buyer and seller. Buyers who have been looking for a downward revision of prices are going to be disappointed. * * * It is no longer merely a question of who can, or will, hold out the longest—that condition no longer exists. Buying has been resumed after a period of waiting and uncertainty, and it is confidently expected that the move in this direction will long be continued. The tendency to buy only for current needs is less apparent than at any time since the armistice was signed. * * * Stocks remain below normal. Total stocks on hand in the Southern territory are two million feet less, all grades combined, as compared with last month. * * * Production in the Eastern territory, however, is not more than sixty per cent. of normal at the present time. * * * The car supply is ample. * * * It must be apparent that the outlook on the whole is favorable for a strong market for all the lumber that can be produced during the coming months."

### February 15:

"There's a reason for everything, and the reason of an association is more than good fellowship, though getting to know the other fellow is usually the first step in the direction of correcting trade abuses."

### March 1:

"The report of stocks on hand sold and unsold as of February 1, 1919, develops a situation that we believe is unparalleled in hardwood lumber industry. In no single month within our recollection has there been such a large and general decrease in stocks on hand as shown by this report.

"The chief factors contributing to this situation are curtailed production and increased volume of sales. * * * At this rate, it will not be long before there is a famine of hardwood lumber. We hear a great deal about the waiting attitude of the buyer, with the expectation of price recession; but with such conditions as are above recited it is difficult to understand why holders of hardwood lumber need worry as to the future. * * * With stocks low and ill-assorted, and with no prospect for restoring them to even last year's meager quantities, the outlook for strong prices on all hardwoods could not be better."

March 8, quoting with approval an article from the Southern Lumberman, the report says:

"For instance, at the recent meeting of the open competition plan of the American Hardwood Manufacturers' Association in Memphis, the fact was developed that the production of mills embraced in that group of manufacturers is at the present time only fifty-six per cent. of normal, and that prac-

tically the same situation exists throughout the hardwood producing territory. * * * Certainly in any other industry the buyers could never expect anything but an advance in price when the supply is below normal, the production is far below normal, and the demand is improving."

### March 22:

"It is one thing for men in a meeting to say, one after another, 'My price is so and so,' with the result that after the meeting all their prices prove substantially the same as the figures mentioned.

"It is quite a different thing for the same men to come to a meeting and each report, 'My actual sales for the past month have been so and so, and I have reported the details of each transaction to the Association.'

"In that statement there is no direct or implied agreement to maintain prices, no obligation of any kind to refrain from cutting.

"The theoretical proposition at the basis of the open competition plan is that *knowledge regarding prices actually made is all that is necessary to keep prices at reasonably stable and normal levels.*"

### March 29:

"Naturally the situation ought to have an important bearing on the plans of every hardwood lumberman if the facts were better understood; offers of business now at shaded prices would get scant consideration, and there would not only be no good reason to cut prices, but there would be every reason why they should be held at reasonably profit-making levels."

With the low stock of hardwood lumber on hand and the reduced production during the first few months of the year, as indicated by these sales reports, the plan, through its manager of statistics, on April 5th, began a propaganda to encourage home building, for the purpose of creating a greater demand for hardwood lumber. On the first page of the report of that date there appears in bold letters the words "BUILD NOW," from which I quote:

"Start the big idea now, the whole country is thinking and talking home building; the government is urging it. Call a meeting to-day; ask every man in your community who is interested in building or building material to attend; then—

"Start something!

"Organize!

"Get the editorial support of all newspapers.

"Appoint a publicity committee which will use every avenue of publicity.

"Ask merchants to put a 'Build Now' slip in packages they deliver.

"Do everything possible to get the old town talking 'Build Now.'

"Don't delay—simply call the men together in your town to do things—you may be assured they will be interested.

"Don't permit your town to be a slacker in the nation-wide movement."

Thereafter on June 7th, following this propaganda, the weekly sales report begins:

"The open competition plan to the American Hardwood Manufacturers' Association has arrived; it is an unqualified success, and any member or any manufacturer who does not think so is simply overlooking the most important of our several association activities. * * * Read the following excerpts from letters written by members."

I only quote a few:

"We believe we have profited from $500 to $1,000 during the past 30 days by being correctly informed relative to the prices stock is really being sold at."

"When a manufacturer situated as ourselves sells stock below the market price, it not only hurts his own business, but it hurts the other fellow who has similar stock to dispose of."

"The very first report which we received under this plan enabled us to increase our price $6 per thousand on a special item in oak."

"At a recent Memphis meeting it developed our company was carrying an unusually large stock in thoroughly dried gum, and seemed to be the only one among those present who had it. Within two weeks from date of this meeting, where it developed there was a big shortage of red gum items, we found a most unusual demand at prices we had not hoped for."

"We were a little hard to persuade to come into the plan; now that we are in and have seen the inside workings of it, we do not see how we could get along without it."

"Since we became members we have been selling out lumber at several dollars per thousand more than formerly."

"Any manufacturer who is trying to do without the help of the association is making a wonderful mistake."

"We find the weekly report of sales a very positive index to the trend of the market on all grades of lumber."

"I consider the report of actual sales of great help in determining the market value of hardwood lumber and believe that the plan is a stabilizing influence, which tends to raise the prices of those who are inclined to cut their prices to the top market prices."

"It is obvious that no one wants to sell his lumber for less than the other fellow is actually getting, and your reports of actual sales enable the manufacturer to see what his neighbors are getting for their lumber, and through this course of education, I might say, all those who have access to your reports bring their prices to the top."

"Our experience has been that the open competition plan has been absolutely accurate, but instead of apparently stabilizing the market, it has caused a runaway market."

"There seems to be a friendly rivalry between members to see who can get the best prices, whereas under the old plan it was cut-throat competition. Now it is a pleasure to sell because *we know* what we are doing and have information at our finger tips that enables us to know these things before the other fellow does."

There is much other documentary evidence to like effect, but this is enough to indicate the common note running through it all, and that common note is "increase of prices." It is difficult, if not impossible, on this record, to escape the conclusion that the purpose and intention of the plan was to suppress competition among its members, and create and perpetuate a condition in the hardwood lumber manufacturing business, wherein the production of hardwood lumber was to be kept low enough to maintain prices on an ascending scale, but not so low as to drive prices to such heights, under the stimulating influence produced by the propaganda to "Build Now," that consumers would be induced to use substitutes. These two objectives mark the margins of the channel through which the members of the plan conducted by its manager of statistics, Mr. Gadd, were to steer interstate commerce in hardwood lumber, and through which it was successfully steered, on up to the filing of this bill, until prices of hardwood lumber had increased from 150 to 250 per cent. within a period of 12 months. I do not doubt that some of the defendants, if not all of them, were advised that the plan was lawful, and that their participation in its operation was lawful; but their conduct must be here considered in the light of results.

It would serve no useful purpose to analyze the evidence, or to enter into a discussion of the decided cases, which have heretofore arisen under the Sherman Act; each case must be determined upon its own facts, and if these facts establish the proposition that the combination entered into unreasonably restrains trade in interstate commerce, by suppressing competition in prices, it falls within the condemnation of the act. Competition and co-operation by and with those engaged in the same business is not necessarily inconsistent. Successful business will likely result from a proper balance of the two, but too much of either may lead to disaster. Competition without co-operation means destructive competition. Co-operation without competition means the destruction of competition—price fixing.[1] The latter is the state of the open competition plan, as disclosed on this record.

It results, from what has been said, that temporary injunction will issue as prayed for in the bill of complaint.

