## UNITED STATES v. RAILWAY EMPLOYÉS' DEPARTMENT, AMERICAN FEDERATION OF LABOR, et al.

(District Court, N. D. Illinois, E. D.   January 5, 1923.)

No. 2943.

**1. Courts ⬅351½—Under federal equity rule, motion to dismiss should be made before answer.**

Under equity rule 29 (198 Fed. xxvi, 115 C. C. A. xxvi), abolishing demurrers and pleas, and requiring defense either by motion to dismiss or by answer, the court can entertain a motion to dismiss for want of equity apparent on the face of the bill at any time before hearing, but the rule contemplates that it shall be made before the answer is filed, since it provides for answer if the motion is denied.

**2. Courts ⬅351½—Answer cannot be considered in determining motion to dismiss.**

A defendant cannot, by filing his answer first, move to dismiss on denials of the allegations of the bill, or on new matter set up in the answer, but the motion must be heard and decided on the allegations of the bill as on demurrer.

**3. Equity ⬅363—Dismissal denied, where doubtful question is raised.**

Courts of equity will overrule the motion to dismiss because the bill does not state facts sufficient to constitute a cause of action, and let the case go to hearing unless the motion is founded on an absolutely clear proposition, and will not dismiss where a doubtful question is raised by the pleadings.

**4. Courts ⬅351½—Improper prayer does not justify dismissal.**

The fact that a bill contains a prayer for relief, which the court was without power to grant under the Clayton Act, does not require its dismissal, where, aside from those portions of the prayer, it charges a combination to commit unlawful acts unduly obstructing the course of trade.

**5. Monopolies ⬅24(1)—Restraint of trade can be enjoined, though also a crime.**

Since both the Sherman Act (Comp. St. §§ 8820–8823, 8827–8830) and Clayton Act invest the District Courts with jurisdiction to restrain violation of those acts, a bill to restrain such violations will not be dismissed, on the ground that it is a bill to enjoin the commission of crimes.

**6. Monopolies ⬅24(2)—Bill to enjoin restraint not dismissed, because strike had terminated.**

A bill to enjoin a conspiracy to interfere with interstate commerce and the transportation of the mails by a strike of railroad employees will not be dismissed, merely because the strike had terminated on most of the railroads, in view of Clayton Act, § 5 (Comp. St. § 8835e), making a decree in a proceeding in equity brought by the United States under the anti-trust laws, to the effect that defendant has violated such laws, prima facie evidence against the defendant in any suit or proceeding brought by another party against such defendant.

**7. Monopolies ⬅24(2)—Bill to enjoin restraint of trade not dismissed because unenforceable against some defendants.**

A bill to enjoin a conspiracy in restraint of trade by striking railway employees will not be dismissed, where some of the defendants had sub-

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

mitted to the jurisdiction of the court and answered, merely because an injunction issued therein could not be enforced against other defendants, who were not inhabitants of the district.

8. **Injunction** &#x29E3;146—**Verified answer after oath was waived has only effect of affidavit.**

Where the oath to the answer was waived by complainants, an answer, though sworn to, is entitled only to the evidential weight of an ex parte affidavit on a motion to dismiss and to dissolve the temporary injunction.

9. **Monopolies** &#x29E3;24(1)—**Clayton Act does not prevent injunction against interference with commerce by strikers.**

Clayton Act, §§ 6, 20 (Comp. St. §§ 8835f, 1243d), relating to injunctions against labor organizations for violation of the anti-trust laws, cannot be given a construction which would permit those organizations to perform acts unlawful on the part of others, and therefore do not prevent an injunction against interference with interstate commerce, or with the transmission of the mails by a conspiracy of striking employees.

10. **Monopolies** &#x29E3;12(1)—**Lawful acts become unlawful when interwoven with inherently unlawful acts.**

Acts lawful in themselves take on an unlawful character, when they are so interwoven with acts inherently criminal that the whole plan must be condemned as a violation of the laws against conspiracies in restraint of interstate commerce.

11. **Monopolies** &#x29E3;24(2)—**Temporary injunction not dissolved because of settlement of strike.**

A temporary injunction issued against striking railway employees will not be dissolved because of the settlement of the strikes with most, but not all. of the railways involved, nor because of questions of territorial limitations on procedure for contempt.

12. **Courts** &#x29E3;352—**Order for special examiner set aside in suit to enjoin restraint of commerce by strikers.**

Under equity rule 46 (198 Fed. xxxi, 115 C. C. A. xxxi), providing that testimony shall be taken in open court, except as otherwise provided by statute or rule, rule 59 (198 Fed. xxxv, 115 C. C. A. xxxv), providing that reference to a master shall be the exception, and not the rule, and Clayton Act, § 13 (Comp. St. § 8835l), providing that in suits by the United States subpœnas for witnesses may run into any judicial district, an order appointing a special master in a suit to enjoin striking railway employees from interfering with interstate commerce and with the transmission of the mails will be set aside, the case set for trial, and depositions taken in accordance with equity rule 47 (198 Fed. xxxi, 115 C. C. A. xxxi).

13. **Equity** &#x29E3;379—**Issue for jury not granted before hearing, except by consent.**

It is the established practice, if not a binding rule, that a court of equity will not grant an issue for a jury trial on motion before hearing, unless on consent.

In Equity. Suit by the United States against the Railway Employés' Department, American Federation of Labor, and others. On motion of defendants for dissolution of the temporary injunction previously granted, and for a dismissal of the bill.

Charles F. Clyne, U. S. Atty., of Chicago, Ill., H. M. Daugherty, Atty. Gen., Blackburn Esterline, Asst. Sol. Gen., of Chicago, Ill., and Orville J. Taylor, Jr., and Jacob M. Dickinson, Sp. Asst. Attys. Gen. for the United States.

Donald R. Richberg, of Chicago, Ill., Frank L. Mulholland, of Toledo, Ohio, and James S. Easby-Smith, of Washington, D. C., for defendants.

&#x29E3;For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

WILKERSON, District Judge. The defendants filed their joint and several answers on October 6, 1922. Thereupon they presented their motion for a dissolution of the temporary injunction granted September 23, 1922, 283 Fed. 479, and for a dismissal of the bill. This motion was argued at length, and briefs have been filed on both sides. The answer contains 56 printed pages, and so far as this motion is concerned may be treated as denying the substantial averments of the bill relative to the alleged unlawful conspiracy to obstruct interstate commerce and the carriage of the mails. The answer also sets up new matter relating to the controversies between the railroad companies and the members of the Federated Shop Crafts the attempts to adjust these controversies prior to the filing of the bill, and the settlements with certain railway companies made subsequent to the filing of the bill.

The principal affirmative contentions in the answer are that the strike was justified by oppressive and unlawful conduct on the part of the managers of the railway companies; that it was prolonged by the refusal of the railway managers to comply with proposals for settlement made by the President and the United States Railroad Labor Board; that the bill in this case, while filed in the name of the United States, was really brought in the interest of an unlawful combination of railway managers; and that the bill cannot be maintained any longer, and cannot proceed to a decree because of settlements between the Federated Shop Crafts and a large number of the railway companies involved, and the abandonment by the defendants of the conspiracy charged in the bill, if one ever existed.

[1] By equity rule 29 (198 Fed. xxvi, 115 C. C. A. xxvi) demurrers and pleas are abolished. Defense must be either by motion to dismiss or by answer. While it is within the discretion of the court to entertain a motion to dismiss for want of equity, apparent upon the face of the bill, at any time before the hearing, the rule contemplates that it be made before the answer is filed. The rule provides:

"If the defendant move to dismiss the bill·or any part thereof, the motion may be set down for hearing by either party upon five days' notice, and, if it be denied, answer shall be filed within five days thereafter or decree pro confesso be entered."

[2, 3] The defendant may not, by filing his answer, move to dismiss upon denials of the allegations of the bill or by new matter set up in his answer. The motion must be heard and decided upon the allegations of the bill as upon demurrer. The rule which prevails in courts of equity, in disposing of motions to dismiss because the bill does not set up facts sufficient to constitute a cause of action, is to overrule the motion and let the case go to hearing, unless it is founded upon an absolutely clear proposition that, taking the allegations to be true, the bill must be dismissed at the hearing. A case in equity involving important matters should go to issue and proofs, where a doubtful question is raised by the pleadings. Kansas v. Colorado, 185 U. S. 125, 144, 22 Sup. Ct. 552, 46 L. Ed. 838; Krouse v. Brevard Tannin Co. et al., 249 Fed. 538, 548, 161 C. C. A. 464.

[4] Defendants assert that the bill should be dismissed because there is a prayer for relief which, under the provisions of the Clayton Act

(38 Stat. 730), the court is without power to grant. It is well established that the bill will not be dismissed if it presents a case for any relief. In Kansas v. Colorado, 185 U. S. at page 145, 22 Sup. Ct. at page 559 (46 L. Ed. 838), it was said:

"Doubtless the specific prayers of this bill are in many respects open to objection, but there is a prayer for general relief, and in that such appropriate decree as the facts might be found to justify could be entered, if consistent with the case made by the bill, and not inconsistent with the specific prayers in whole or in part, if that were also essential. Tayloe v. Merchants' Insurance Co., 9 How. 390, 406; Daniell, Ch. Pr. (4th Am. Ed.) 380."

Apart from those portions of the prayer for relief, which it claimed contravene sections 6 and 20 of the Clayton Act (Comp. St. §§ 8835f, 1243d), the bill certainly charges a combination and conspiracy to do acts which are unlawful in themselves, and which by reason of their inherent nature prejudice the public interests by unduly obstructing the course of trade. Nash v. United States, 229 U. S. 373, 376, 33 Sup. Ct. 780, 57 L. Ed. 1232; Duplex Printing Press Co. v. Deering, 254 U. S. 443, 468, 470, 41 Sup. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196.

[5] The argument of the defendants that the bill, if its scope is thus narrowed, becomes merely a bill to enjoin the commission of crimes, overlooks the provisions of the Sherman Law (Comp. St. §§ 8820–8823, 8827–8830) and Clayton Law (38 Stat. 730), which invest the District Courts of the United States with jurisdiction to prevent and restrain violations of those laws. In United States v. Trans-Missouri Freight Association, 166 U. S. 290, 342, 17 Sup. Ct. 540, 559 (41 L. Ed. 1007) the court said:

"The civil remedy by injunction and the liability to punishment under the criminal provisions of the [Sherman] Act are entirely distinct. * * * Congress, having the control of interstate commerce, has also the duty of protecting it, and it is entirely competent for that body to give the remedy by injunction as more efficient than any other civil remedy. The subject is fully and ably discussed in the case of In re Debs, 158 U. S. 564."

[6, 7] Defendants claim that the bill should be dismissed, because the alleged basis for relief no longer exists. It is asserted in the answer and affidavits that the strike has been settled on many of the railroads involved, and that the conspiracy charged in the bill has disappeared. It is argued, therefore, that, inasmuch as decrees in equity are based upon circumstances and rights existing at the time of the entry of the decree, there is no reason why this suit should proceed further. Here, again, defendants overlook the fact that this objection does not arise on the allegations of the bill, and therefore furnishes no ground for its dismissal. Dixon v. Anderson, 252 Fed. 694, 696, 164 C. C. A. 534; Krouse v. Brevard Tannin Co., 249 Fed. 538, 548, 161 C. C. A. 464.

However, this objection to proceeding with the cause, even if it were properly raised, is without merit. In United States v. Trans-Missouri Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007, it was urged that there should not be a hearing of the appeal because the association against which complaint was made in the bill had been dissolved. The Supreme Court had no difficulty in denying this contention. The court said:

"The mere dissolution of the association is not the most important object of this litigation. The judgment of the court is sought upon the question of the legality of the agreement itself, for the carrying out of which the association was formed, and, if such agreement be declared to be illegal, the court is asked, not only to dissolve the association named in the bill, but that the defendants should be enjoined for the future. The defendants, in bringing to the notice of the court the fact of the dissolution of the association, take pains to show that such dissolution had no connection or relation whatever with the pendency of this suit, and that the association was not terminated on that account. They do not admit the illegality of the agreement, nor do they allege their purpose not to enter into a similar one in the immediate future. On the contrary, by their answers the defendants claim that the agreement is a perfectly proper, legitimate, and salutary one. and that it, or one like it, is necessary to the prosperity of the companies. * * * Private parties may settle their controversies at any time, and rights which a plaintiff may have had at the time of the commencement of the action may terminate before judgment is obtained, or while the case is on appeal, and in any such case the court, being informed of the facts, will proceed no further in the action. Here, however, there has been no extinguishment of the rights (whatever they are) of the public, the enforcement of which the government has endeavored to procure by a judgment of a court under the provisions of the act of Congress above cited."

Section 5 of the Clayton Act (Comp. St. § 8835e) provides that a decree in a proceeding in equity brought by the United States under the anti-trust laws, to the effect that a defendant has violated such laws shall be prima facie evidence against such defendant in any suit or proceeding brought by any party against such defendant under said laws as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto.

The situation here is analogous to the one in Southern Pacific Co. v. Interstate Commerce Commission, 219 U. S. 433, 31 Sup. Ct. 288, 55 L. Ed. 283, where it was claimed that the questions arising for decision were moot because, in view of the lapse of time, the order of the Interstate Commerce Commission had spent its force. The court pointed out that clearly the suggestion was without merit—

"in view of the possible liability for reparation to which the railroads might be subjected if the legality were not determined, and the influence and effect which the existence of the rate fixed for two years, if it were legal, would have upon the exercise by the railroads of their authority to fix just and reasonable rates in the future."

See, also, Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U. S. 498, 515, 31 Sup. Ct. 279, 55 L. Ed. 310; Boise City Irrigation & Land Co. v. Clark, 131 Fed. 415, 65 C. C. A. 399; United States v. Workingmen's Council, etc. (C. C.) 54 Fed. 994, 995, 26 L. R. A. 158; 2 High on Injunctions (1905, 4th Ed.) § 1508.

It must be borne in mind, also, that defendants do not claim that there has been a cessation of the activities of the strikers upon all of the railroads involved, and that the complainant has made affirmative showing of unlawful acts continuing to the time of the filing of the motion to dismiss.

Another objection to the maintenance of this suit, which is urged by defendants, is that there are territorial limitations upon the court's jurisdiction to enforce the injunction against defendants who are not inhabitants of this district. The defendants have appeared and answered,

and, of course, will be bound by whatever decree is entered. This, in view of section 5 of the Clayton Act, makes it proper that the case should proceed to a decree, if warranted by the evidence, whatever questions may arise in connection with the execution of the decree. It is not necessary at this time to anticipate questions of procedure which may arise in connection with violations of an injunction which may be entered if the plaintiff maintains its bill at the hearing. On the contrary, it is improper now to indulge in speculations that the defendants will disobey the order of the court. It is sufficient that this case falls within the general jurisdiction of the District Courts, and that this court may enter a decree which is binding upon the defendants who have appeared and answered. United States v. Standard Oil Co. (C. C.) 152 Fed. 290; Id. (C. C.) 173 Fed. 177; Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; U. S. v. American Column & Lumber Co. (D. C.) 263 Fed. 147; Id., 257 U. S. 377, 42 Sup. Ct. 114, 66 L. Ed. 284. None of the grounds advanced by defendants justifies a dismissal of the bill at this stage of the proceedings.

[8] The failure of the motion to dismiss necessarily results, upon the record as now made, in continuing the temporary injunction until the final hearing. The showing upon which that injunction was granted has not been changed in any substantial respect by the answer and accompanying affidavits. It is unnecessary to repeat what was said in disposing of that motion. The oath to the answer was waived, and, though sworn to, the answer is entitled only to the evidential weight of an ex parte affidavit upon this motion. Pere Marquette Railroad Co. v. Bradford (C. C.) 149 Fed. 492, 496.

The answer must be read in the light of the admitted acts and declarations of the defendants during the progress of the strike. The denials and affirmative averments of the answer and accompanying affidavits are insufficient, in view of the declarations in the bulletins of the defendants, extracts from which are hereto appended, to overcome the showing made by the plaintiff. The record does not warrant a change in the findings which were made in granting the temporary injunction as to the unlawful purpose of the combination and the relation of acts lawful in themselves to the series of unlawful acts.

[9] The claim that parts of the injunction are inhibited by sections 6 and 20 of the Clayton Law proceeds upon a view of those sections which is not permissible under fundamental rules of construction, and which is out of harmony with the opinion of the Supreme Court in Duplex Printing Press Co. v. Deering, 254 U. S. 443, 469, 470, 41 Sup. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196. As to section 6, little need be said concerning an argument which fails to give effect to the clear language of the Supreme Court (254 U. S. 469, 41 Sup. Ct. 177 [65 L. Ed. 349, 16 A. L. R. 196]):

"And by no fair or permissible construction can it [section 6] be taken as authorizing any activity otherwise unlawful, or enabling a normal lawful organization to become a cloak for an unlawful combination or conspiracy in restraint of trade as defined by the anti-trust law."

Defendants' construction of section 20 would confer immunity upon the specified acts when committed in a labor controversy, even though back of that controversy there was a conspiracy to overthrow the government itself.

The line between the legitimate purpose of carrying on a controversy between employer and employee and the unlawful purpose of inflicting public injury by unduly obstructing the course of trade must be drawn in accordance with the rule which has been laid down for the interpretation and application of the Sherman Act. Nash v. United States, 229 U. S. 376, 33 Sup. Ct. 780, 57 L. Ed. 1232; United States v. American Tobacco Co., 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663; Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; United States v. Joint Traffic Association, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259. That rule is ignored by defendants, when they claim that the construction of the statute invoked by the United States here strikes down all legitimate activities of labor unions. In this connection the language of the Supreme Court in United States v. Joint Traffic Association, supra, applies forcibly. The court (171 U. S. 568, 19 Sup. Ct. 31, 43 L. Ed. 259) there said:

"We also repeat what is said in the case above cited, that 'the act of Congress must have a reasonable construction, or else there would scarcely be an agreement or contract among business men that could not be said to have, indirectly or remotely, some bearing upon interstate commerce, and possibly to restrain it.' To suppose as is assumed by counsel, that the effect of the decision in the Trans-Missouri Case is to render illegal most business contracts or combinations, however indispensable and necessary they may be, because, as they assert, they all restrain trade in some remote and indirect degree, is to make a most violent assumption, and one not called for or justified by the decision mentioned, or by any other decision of this court."

And in Nash v. United States, supra, it was said (229 U. S. 378, 33 Sup. Ct. 782, 57 L. Ed. 1232):

"As to the suggestion that the matters alleged to have been contemplated would not have constituted an offense if they had been done, it is enough to say that some of them conceivably might have been adequate to accomplish the result, and that the intent alleged would convert what on their face might be no more than ordinary acts of competition or the small dishonesties of trade into a conspiracy of wider scope, as has been explained more than once. Swift & Co. v. United States, 196 U. S. 375, 396; Loewe v. Lawlor, 208 U. S. 274, 299."

[10] The principle that acts lawful in themselves take on an unlawful character when they are so interwoven with acts inherently criminal that the whole plan must be condemned is one of such frequent application that it is unnecessary to comment upon it, further than to mention its application in Gompers v. Buck's Stove & Range Co., 221 U. S. 418, 31 Sup. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874. The court said (221 U. S. 439, 31 Sup. Ct. 497, 55 L. Ed. 797, 34 L. R. A. [N. S.] 874):

"In the case of an unlawful conspiracy, the agreement to act in concert when the signal is published gives the words 'Unfair,' 'We don't patronize,' or similar expressions, a force not inhering in the words themselves, and therefore exceeding any possible right of speech which a single individual

might have. Under such circumstances they become what have been called 'verbal acts,' and as much subject to injunction as the use of any other force whereby property is unlawfully damaged."

[11] The settlement of the strike on the part of the railroads and the alleged territorial limitations upon process in contempt proceedings furnish no stronger grounds for dissolving the injunction than for dismissing the bill. The defendants are here asserting their right to do the things which are forbidden by the injunction. Questions of procedure, in case there are violations of the injunction, can be disposed of if and when they arise. The motions to dismiss the bill and to dissolve the injunction are denied, and the case will proceed to a final hearing.

[12] Equity rule 46 (198 Fed. xxxi, 115 C. C. A. xxxi) provides that:

"In all trials in equity the testimony of witnesses shall be taken orally in open court, except as otherwise provided by statute or these rules."

Equity rule 59 (198 Fed. xxxv, 115 C. C. A. xxxv) provides that:

"Save in matters of account reference to a master shall be the exception, not the rule, and shall be made only upon the showing that some exceptional condition requires it."

Section 13 of the Clayton Act (Comp. St. § 8835*l*) provides that, in suits brought by the United States, subpœnas for witnesses may run into any judicial district, and makes possible upon application and proper showing the examination at the trial of witnesses who live out of the district and more than 100 miles from the place of trial. There is no reason for departing in this case from the usual procedure in equity trials in the federal courts, and the case is set for trial on May 2, 1923.

The order appointing a special examiner is set aside and the rule as to depositions, unless the parties otherwise agree or proper showing is made for its modification, will be in harmony with equity rule 47 (198 Fed. xxxi, 115 C. C. A. xxxi) that the depositions of the plaintiff shall be taken and filed within 60 days from January 8, 1923, those of defendants within 30 days from the expiration of the time for the filing of the plaintiff's depositions, and rebutting depositions by either party within 20 days after the time for taking the original depositions expires. The depositions will be taken in accordance with the statutory procedure, reserving to either party, however, the right to apply for the appointment of a special examiner to take evidence at specified times and places.

[13] As to the motion for a jury trial, it is the well-established practice, if not a binding rule, that the court will not grant an issue upon motion before hearing unless upon consent. Fenno v. Primrose (C. C.) 125 Fed. 635, 637. In view of the order as to the method of proof and trial, ruling on this motion will be reserved until the final hearing.

### Extracts from Strike Bulletins.

Strike Bulletin No. 1 contains the following:

"Liberty Bell rang out in tones clear as on Independence Day of 1776, when promptly at 10 a. m., Saturday, July 1, the 'minute men' of organized labor in American railroad industry quit their work en masse as the only recourse left after two years of negotiation and 'buck passing' on the part of the

railroad managers and a series of 'injuries and usurpations' by the United States Railroad Labor Board. This is the first nation-wide strike of federated shop crafts in the history of our movement, and the solidarity shown at the beginning should assure a clean-cut victory at its termination. One of the encouraging signs is that the men struck in even larger percentage of numbers than they voted in the referendum, which, by the way, was about double in volume that of any referendum vote ever taken by the shop crafts.

"From every railroad center comes reports to Department Headquarters in Chicago that the cessation of work is from 95 to 100 per cent. perfect. No disorder marred the exodus at any point.' Nonunion workers, foremen and employés of other classes joined the shopmen in many instances. * * *

"At a meeting of the Executive Boards of Divisions 1, 2 and 3, and the Executive Council of the Department, held in Chicago, June 24, 25 and 26, it was voted to sanction a strike in accordance with the overwhelming favorable vote cast by the six crafts on the three propositions submitted. These ballots were mailed on June 8, after every honest effort to obtain redress of our grievances through the Railroad Labor Board had failed. The prompt response of the membership is the best evidence that the men are determined to carry the fight to a successful conclusion, whatever may be the sacrifice and hardship.

"Therefore, in conformity with resolutions adopted, and as a result of Decision No. 1036 (Docket 1300) of the Railroad Labor Board, these strike ballots were spread over all railroads in the United States, on the three issues involved, namely, Rules, Contracting out of Shops, and the Reduction of Wages. The vote on these propositions ranged from 94.5 to 97 in favor of going out on strike.

"Acting under this mandate of the membership, the six International Presidents of the Federated Shop Craft organizations, on Thursday, June 29th, sent the following identical telegram to the officers and members of each local union affiliated with these internationals:

" 'In compliance with the strike vote, all shop craft employés below the rank of general foremen are hereby granted sanction to suspend work 10 a. m., July 1, on all railroads and Pullman shops in the United States. Notify all outside points. Wire number responding and number remaining at work.'

"The militant labor spirit of the men on the firing line measured up practically 100 per cent. perfect. A few weak spots are being taken care of. Our membership will not be influenced by statements in the public press, intended to discourage and weaken their morale. Men of the shop crafts are made of the stuff that has stood the crucible of long suffering and sacrifice. They will stand a phalanx against all assaults made upon them by the managers and corporation-subsidized press.

"The men will remain away from their jobs at the shops and roundhouses until the just and reasonable demands made upon the Association of Railway Executives, embodied in the letter of the Executive Council to Chairman Thomas De Witt Cuyler, Friday, June 30, are complied with."

Strike Bulletin No. 2, issued July 12, 1922, contains the following:

"We have got the railroads in the hole. They know it, and if any of the brothers feel at all doubtful of our position, let them consider the following facts:

"Industrial and business conditions throughout the country are picking up strongly.

"Steel and iron production is steadily increasing and activity and preparations for further activity in all other lines are increasing.

"Dun's and Bradstreet's report steady betterment of conditions all along the line.

"This means that the railroads have got to carry a tremendous amount of freight in the next few months. Already since the beginning of the year their earnings and business have increased tremendously over a corresponding period last year.

"Railroad management anticipated this increased business and ordered 100,000 new freight cars in the first 6 months of this year, as compared with only 30,000 new cars ordered during all of last year.

"The present demand for rolling stock is about 300 per cent. more than the average for the last five years.

"The demand for new locomotives has also increased.

"The prolonged coal strike means that there has got to be a tremendous movement of coal between now and December in order to supply both domestic users, industrial concerns and public utilities.

"Over a week ago the U. S. Geological Survey reported that the existing coal reserves are the lowest they can possiby go without endangering the future regular supply.

"The threatened strike of seamen on the Great Lakes,' if it happens, will probably throw still more burden of moving coal on the railroads.

"Reports in the financial and trade papers state that coal shipments from the Kentucky field, over the L. & N. have already been cut down one-half, owing to car congestion. Most of the existing supply of bituminous coal is now coming from this field.

"The latest reports of condition of railroad equipment, namely, those for April, show that both locomotives and cars on many roads are in bad order. The following are the percentages of bad order cars and locomotives on the roads indicated:

Percentage of Bad Order Equipment.

| Name of Road. | Locomotives. % | Cars. % |
|---|---|---|
| B. & M. | 29.5 | 18.8 |
| N. Y., N. H. & H. | 23.1 | 24.9 |
| D., L. & W. | 16.4 | 10.4 |
| Erie | 29.5 | 18.1 |
| Michigan Central | 21.9 | 18.5 |
| N. Y. C. | 35.6 | 18.7 |
| P. M. | 23.8 | 18.2 |
| P. & L. E. | 14.1 | 38.2 |
| Wabash | 21.8 | 11.8 |
| B. & O. | 33.4 | 14.5 |
| Big Four | 30.5 | 16.1 |
| Penn. | 25.4 | 12.5 |
| C. & O. | 19.8 | 13.6 |
| N. & W. | 13.6 | 5.0 |
| A. C. L. | 24.7 | 13.8 |
| C. of G. | 18.0 | 15.8 |
| L. & N. | 12.0 | 11.1 |
| S. A. L. | 27.1 | 31.9 |
| Southern | 17.6 | 17.6 |
| C. & N. W. | 22.7 | 7.5 |
| C., M. & St P | 21.5 | 15.3 |
| G. N. | 19.3 | 14.7 |
| N. P. | 22.2 | 10.0 |
| A., T. & S. F. | 16.7 | 7.7 |
| C., B. & Q. | 25.4 | 8.2 |
| C., R. I. & P. | 19.1 | 9.0 |
| So. Pac. | 27.7 | 6.6 |
| U. P. | 25.4 | 14.6 |
| M. P. | 29.4 | 14.6 |
| M., K. & T. | 39.0 | 7.0 |
| So. Pac. in Tex. and La. | 32.5 | 8.9 |

"The outside contractors cannot handle all this repair work, and most railroads are far enough from the contractors' plants, so that the problem of hauling the bad order equipment to the contractors is a big one.

"Along with the increasing industrial activity the demand for labor in

outside industries is increasing, and that means that the railroads cannot get enough men to replace these who are now out on strike.

"All this means that time is with us. Every day we hold out weakens the railroads and strengthens our hand when we come eventually to settling terms. This is the main reason why the railroad managements are trying to stir up violence, so as to be able if possible, to call in the troops and endeavor to break our united front in that way."

### Strike Bulletin No. 3, issued July 18, 1922, contains the following:

"The most significant development in this strike is the fact that the number on strike increases substantially from day to day. Men who stayed in on July 1st have since recognized the unmanly part they were playing, have obeyed the dictates of their better nature, with the result that they are now on the picket line fearlessly fighting the great fight. Our experiences in the past have very frequently been the opposite.

"The second surprising thing is the suddenness with which the strike became effective. Shopmen's strikes usually require from 30 to 60 days to become embarrassing, but in this case there are several railroads that have almost closed down, many that have abandoned entire divisions, and all of them have curtailed operations from 30 to 50 per cent.

"For the week ending July 15th not a passenger train of any consequence arriving in Chicago on time. The overdue list showing from 20 minutes to 5½ hours' delay.

"The iron and steel industries are shouting for help.

"The scab coal mines of West Virginia are entirely bottled up.

"A great portion of the fruit crop of the Pacific Coast is in danger of destruction as a result of car shortage.

"The grain crop of the Middle West should now be moving and as a result of the miners' strike no coal has been available for the Northwestern States and it usually consumes the entire summer months to lay up a sufficient stock in the main distributing centers of the Northwest to take care of the winter needs.

"These great losses, with probable suffering and inconvenience to follow, are not pleasant things to contemplate and were these organizations the sole contributors their position would be difficult to defend, but for two long years, while management has been breaking down our conditions of employment, lowering our wages, violating the Transportation Act in devious ways and treating decisions of the Railroad Labor Board that were favorable to us with contempt and indifference, they have as a part of their program been attempting to subdue their employés with the specter of starvation brought about by prolonged periods of unemployment, closing down of practically all of their shops for various periods of time, with the inevitable result that when the employés reached the point that they would not willingly submit longer to these injustices, the equipment of the railroads was so run down and in such a condition of disrepair that the whole transportation system of our country has practically broken down. This condition, of course, is of immeasurable value to the employés now on strike, because it assures a reasonably speedy termination of the dispute. The membership and the officers seek to terminate it and will do so upon the first honorable basis that is proposed."

### Strike Bulletin No. 4, issued July 25, 1922, contains the following:

"Every day railroads are placing an embargo, not only upon ordinary freight, but upon perishables, live stock, etc.

"These statements are not made with the object of bolstering a faltering army, because this army has demonstrated that it needs no bolstering, but, if anything, requires to be held in check, but they are predicated upon cold statistical matter contained in the financial dailies of all the large cities of the country. Our strike is, therefore, a success from our point of view beyond any of our fondest dreams, and if continued in its present effectiveness, it

cannot fail but to bring results in the very near future; and, in the language of Admiral Nelson, 'Every man is expected to do his duty.'

" 'Southern Railway:

" 'Normal amount of bad order cars at this point is 600; there are 1,679 bad order cars on this date here; all side tracks are full. As to locomotives the company had several locomotives in good repair held in reserve prior to the strike, but at this time all of them have been put in service, and something like 20 or 25 have been placed in the Harding tracks, and will have to stay there until they get mechanics to repair them.'

"Newspaper reports show the following:

" 'Over 350 passenger trains have been canceled by railroads. The car situation is daily becoming more congested. Power gets worse hourly. More and more iron and steel furnaces are closing. Newspapers mention especially furnace shut-downs of Carnegie Steel Company, Bethlehem Steel Company, Republic Steel, Youngstown, and Brier Hill Steel.

" 'Three roads have placed embargoes on grain shipments. Railroads are refusing shipments urgently needed by industrial plants. Shortage of coal is slowing up the boats in New York Harbor. Steamers on the Great Lakes are having to curtail operations for lack of coal. There is a great shortage of fuel at the head of the lakes. The C. & A., the C., R. I. & P., and other roads are reported to have less than two weeks' supply of coal for themselves. There is a shortage of bunker coal at Hampton Roads, and 22 boats are tied up there for lack of it. Coal at that point used to come over the Virginia, Norfolk & Western, and C. & O. Lumber shipments are greatly delayed. Shortage of cars shut down several factories. Railroads are moving only part of the perishable fruit crops of California, Michigan, Georgia, and Florida.' "

Strike Bulletin No. 5, issued August 3, 1922, contains the following:

"Locomotives are in alarmingly bad shape. Several roads, which had a lot of engines in white lead, have had to take them all out, and even they have begun to go to pieces. Our direct reports from all system federations show this, in absolute contradiction to the railroad publicity. The number of engine failures and defects is not the same from day to day, but increase rapidly every day. Railroads which had excess power have had to loan some of it to others.

"Bad order cars are also piling up ominously. Coal car congestion is acute. 3,600 loaded coal cars were reported blockaded on the L. & N. at Corbin, Ky., the western gateway of the Kentucky coal fields. On July 26th, about 25,000 loaded coal cars were tied up between mines and destination. Most of these were on the C. & O. and L. & N. Grain merchants are worried at the shortage of grain cars. Shipments of live stock are badly delayed. Shortage of tank cars is cutting down available supplies of fuel oil.

"A rapidly increasing number of iron and steel furnaces have been forced to shut down for lack of coal. Fuel shortage is slowing down grain thrashing. Flour mills are closing. Municipal lighting and power plants are dangerously near shut-down because of no coal. The automobile business is worried because of car shortage. Fruit shipments are still further reduced.

"But the pressure of future traffic is far greater even than that of the present. An approaching settlement of the coal strike makes it essential to have the cars and power to move the coal. If the crops are not moved, and the country does not get its winter fuel, the public wrath will hit the railroad executives and bankers far harder than they are prepared to stand. Despite all the distorted hostile news and prejudiced newspaper editorials, public sympathy all along the railroads is with us. On several large western railroads the farmers are feeding the strikers and merchants are making gifts and extending credit freely. The wonderful spirit of the large proportion of striking Pennsylvania employés is hitting home at Atterbury himself. The folly and stupidity of the bankers and railroad presidents has disgusted the real railroad managers. They obey orders, but only half-heartedly.

"This strike has been labor's Battle of the Marne. For two years we have had to retreat. Labor everywhere has suffered wage cuts, degradations in working conditions, bitter attacks and defeats all along the line. This fight is

to be the turning point. The harder and more determinedly we hold our ground now and fight back, the more complete and rapid will be our recovery. The stronger we fight as we approach the settlement, the less likely will our opponents be to try to stage a return fight soon again."

### Strike Bulletin No. 6, issued August 9, 1922, contains the following:

"It is our very definite conclusion at this moment that an overwhelming majority of the American people has long recognized the righteousness of our struggle, but for obvious reasons have failed to publicly express themselves; but the shopmen are now in the driver's seat, and the whole nation is on our side. They cry from the housetops for some pressure to be brought upon railway managements, and it is safe to say that there has never been a strike in the history of this nation of which the public were at first so apprehensive, and yet, after becoming acquainted with the facts, their sentiment so rapidly crystallized on our side of the dispute.

"It is a safe prediction that the American people will not permit of this struggle lasting much longer. However, until the force of public opinion brings about a settlement, we must assume the attitude that it is a fight to a finish. That being true, the only position which we can take in self-defense is a position of war to the hilt, and any man now on strike who has not done everything possible within the laws of the land and the rules of reason has done less than his full duty to himself, his family, and his fellow men.

"If it is war to the finish, we are prepared, and, in the language of the Civil War, 'We will fight it out on this line if it takes all summer'—yes, and several summers.

"Except for the obviously distorted and untrue railroad propaganda, all the events of this past week have shown that the effectiveness of our strike is increasing steadily and rapidly, like a snowball rolling down hill.

"The financial and trade papers report that movements of live stock are smaller and more delayed; an irregularly increasing shortage of grain cars; a shortage of tank cars for fuel oil; continuing car shortage, delay, and congestion in movement of coal; shortage of cars for lumber, especially in the Northwest; and quite a few more iron furnaces and steel mills shut down for lack of coal. There are more embargoes, more trains taken off the schedule, more train delays. Even the Pennsylvania Railroad is now so squeezed for coal that it is to commandeer 20 per cent. of all the coal produced along its lines for its own use. Freight from the West coast is beginning to be shipped via the Panama Canal in preference to railroad. Interstate Commerce Commission priorities and regulations have been extended to cover perishable freight and other articles, as well as coal. These regulations will pinch certain interests that heretofore have not felt the strike directly.

"The same story is confirmed by the reports of our own men off the lines in all parts of the country. President Harding's second request to President Jewell to come to Washington is another telling evidence of the power of our strike."

### Strike Bulletin No. 7, issued August 21, 1922, contains the following:

"The general situation may be summed up in one sentence: We are winning; otherwise, no one would interest themselves sufficiently to attempt to bring about a settlement. Rest assured that this strike has aroused the American people as no previous strike in the nation's history. They have visions of a fuelless and foodless winter, with the transportation system of the nation practically a derelict."

### Strike Bulletin No. 8, issued August 28, 1922, contains the following:

"We have now reached the point where the entire country admits the power and effectiveness of our strike and is seriously anxious for a settlement. That confession comes from the President, from Congress, from the Interstate Commerce Commission, from Governors of states, from the actions of the United States Steel Corporation, Ford, the packers, and thousands of factories, big and little. It is admitted in trade papers and newspapers everywhere.

"Trade and market reports state that the shortage in grain cars is increasing; also that tank cars for fuel are very hard to get. Congestion continues, especially on the coal-carrying roads. Lumber mills are finding very great difficulty in getting cars. Many municipal light plants are now forced to suspend operations after 10 p. m., because of shortage of fuel. Four more steel mills around Chicago have shut down this past week, making a total decrease of operations amounting to 30 per cent. since the beginning of the strike. The United States Geological Survey cautiously says 'While mines long closed by the strike are reopened, there has been a recurrence of railroad disability in certain of the nonunion and open shop fields.' The leading journal of the lumber trade, called the American Lumberman, says: 'The rail situation in the South is particularly unpleasant. In some cases the manufacturers cannot obtain cars; and in other cases, once the car is loaded, the railroads seem unable to move them. Opinion of the lumber trade is that, even if the coal and railroad strikes are settled immediately, there will be an extremely serious car shortage.'

"The record of what has been accomplished as it comes in reports to the department is tremendous. Unfortunately space and time do not permit us to give these reports to the members. Not even the I. C. C. realizes the extent of the bad order equipment, because it has only 50 inspectors of cars and 50 inspectors of locomotives for the entire country, and it is obviously impossible for them to cover the ground or in any way be thorough.

"According to the reports of the coal trade in the Chicago Journal of Commerce for August 24th, after two weeks more of our strike 'the rail equipment would not be able to stand up, and there would be trouble in getting the cars out' of the coal fields. Inasmuch as the country has got to have coal, the railroad managers will have to give up their attempt to smash our organization, and at least consent to the settlement terms which were first proposed by President Harding.

"The railroad executives can pooh-pooh all they please, but their own actions, as well as all the other evidence, proves that our strike is strong enough to win.

"It is our job now to realize our strength and the strength of our position and the circumstances, and hold fast and secure a more decisive victory even than the miners won.

"In last week's bulletin, we pointed out that we were entering the period when equipment would fail much more rapidly than hitherto. That is coming true.

"The number of wrecks due to bad order equipment has increased this past week. In addition to those reported in the public press, we have reports from several lines of locomotives leaving the rails because of sharp flanges, and one instance where the engineer and fireman were badly scalded as a result of a burnt crown sheet. We have reports of wrecks and collisions due to defective equipment on the Santa Fé, L. & N., M. & N. A., B. & O., S. A. L., Southern, N. & W., C. & N. W., and others. There will be an increasing number of wrecks due to these causes, bad air and defective brakes. This increasing bad order equipment will inevitably affect still further the attitude and action of the train and engine service employes. They have walked out on one division of the Southern Railroad and of the Rock Island."

Strike Bulletin No. 9, issued September 1, 1922, contains the following:

"The week has passed, and the strike is more effective now than it ever was, and Atterbury is strangely silent. But perhaps you are staggered by the report of the Interstate Commerce Commission, which tells that over one-half of the country's 70,000 locomotives are unsafe to be in service, and that thousands of those locomotives are in service in violation of the Interstate Commerce Commission rules.

"Meanwhile the strain on equipment is rapidly mounting, with the beginning of coal movement after the close of the coal strike, and with the increasing demands for movement of the crops. Also our reports show, as was expected, that now at the end of 60 days of the strike the locomotives and

cars are going to pieces much more rapidly than before. The Interstate Commerce Commission report to the Senate indicates that half of the locomotives of the country were in bad order August 1st. They must be in far worse shape now. The Commission admits that it hasn't got enough inspectors to cover the ground. We can be sure that conditions are much worse than the report shows.

"The official report of the United States Department of Commerce for August 25th shows that there is a car shortage of 24,943 cars. Also that this is the highest since the end of 1920, five times greater than the shortage for June, 1922, and over six times greater than the same date in 1921. This shortage will now increase by leaps and bounds, with the demands for coal and grain movement.

"The bankers deliberately brought about this strike by their attacks on our standards of living and working conditions, hoping that they could smash our organizations. They miscalculated on our unity and strength of will. They refused to settle the strike, expecting our ranks to break. Again they were mistaken. Having made those mistakes, it is now too late for them to get enough engines and cars repaired in outside shops to meet the demand. Whatever new equipment they can secure will not be enough. The scabs are too few and too ignorant and clumsy to do the necessary work. Now the railroad banker executives are caught in their own trap. The steadily increasing traffic demands of coal, grain, lumber, iron and steel, oil and manufactured products will be running over their obstinacy like a steam roller."